**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL NO.  25-0091** |
| | : | |
| **JEAN ESPINOSA** | : | |

**Scott, J.**                                                                                          **July 20, 2026**

## MEMORANDUM

On March 12, 2025, Defendant Jean Espinosa was indicted on one count of possession with intent to distribute 400 grams or more of fentanyl, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A) and on one count of possession of a firearm in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i).  ECF No. 1 at 1–4.  Espinosa now moves the Court to suppress evidence obtained during the execution of a search warrant, including statements he made during an interview after his arrest, because he did not receive the appropriate warnings before being interrogated, as required by *Miranda v. Arizona*, 384 U.S. 436, 478–79 (1966).  For reasons explained below, the Court grants in part and denies in part Defendant Espinosa's motion.

### I.      Factual Background

On December 17, 2024, law enforcement officers executed a search warrant at a home in Northeast Philadelphia based on an investigation that revealed the home was used to store and package large quantities of fentanyl.  ECF No. 79 at 8:14–20 (hereinafter, "Hr'g Tr.").  Shortly after the officers arrived, Defendant Espinosa was handcuffed and placed outside while officers searched the home.  *Id.* at 9:18–19.  After Espinosa was detained, his girlfriend descended from the second story of the home, and she too was handcuffed while officers searched the home.  *Id.* at 9:20–22.  When Espinosa saw that his girlfriend was handcuffed, crying, and scared, he told the

1

officers that "everything [inside the house] is mine." *Id.* at 36:20. Espinosa made this statement even though no law enforcement agent asked him any questions. *Id.* at 60:16–61: 4. When the officers completed the search and secured the residence, two officers and one special agent of the Federal Bureau of Investigation took Espinosa to a middle bedroom on the second floor of the residence. *Id.* at 10:14–20.

The sequence of events in the middle bedroom is disputed by the Parties. On the government's view, the officers spoke with Espinosa briefly, asking him whether he was interested in cooperating, and, after Espinosa affirmed, an officer went to his vehicle to obtain the appropriate paperwork—an Advice of Rights form—to mirandize Espinosa. *Id.* at 11:2–5. While one officer obtained the paperwork, the other two apparently engaged in "small talk" with Espinosa while avoiding any substantive questions before Espinosa was advised of his *Miranda* rights. *Id.* at 26:24–25. Once the officer returned, Espinosa received an Advice of Rights form, which he signed and which indicates—through a handwritten section of the form—that he was advised of these rights at 11:00 am on December 17, 2024 at the home that was covered by the search warrant. ECF No. 71 at 10. After fifteen to twenty minutes of questioning, the officers decided that the conversation was significant enough to warrant transporting Espinosa to the FBI building for further interrogation. Hr'g Tr. at 28:3–6.

Espinosa does not deny that he signed this form, but he disputes when and where he signed it. Espinosa testified that the 11:00 am handwritten timestamp on the form is mistaken; he signed this form at the FBI building during the second round of interrogation after he was already questioned by officers at his home. *Id.* at 42:22–43:8; 44:21–23. In the middle bedroom, the officers evidently told Espinosa that everyone in the house "was going to be arrested" and that Espinosa had a chance to help himself, which prompted Espinosa to say that he'll "do anything"

2

to absolve others in the house (particularly, his girlfriend). *Id.* at 40:4–14. In that bedroom, the officers also collected Espinosa's DNA and his phone passcode, so that they could unlock his phone. *Id.* at 40:21–22. The officers also told Espinosa that "no one knew" they were at his house that day and that he should not call a lawyer because "the word [may] get out in the street that [Espinosa] was arrested." *Id.* at 41:9–16.

After the round of questioning at his house, officers transported Espinosa the FBI Philadelphia Field Office, where he was again interrogated for approximately an hour. *Id.* at 45:4–5. Espinosa testified that, while at the FBI office, he never read the Advice of Rights form (but that it was read to him), and that he signed the form prior to the second round of questioning. *Id.* at 44:1–14. The second round of questioning—and Espinosa's answers to those questions—mirrored the first round of questions and answers in the home. *See id.* at 43:10–12; *id.* at 52:22–53:4 ("After I signed the [Advice of Rights] paper, [the officers] asked me all the same questions again."); *see also* ECF No. 71 at 3. Espinosa further testified that, had he been advised of his *Miranda* rights at the home, he "wouldn't have had any kind of conversation" with the officers. Hr'g Tr. at 45:11–12.

On April 21, 2026, the Court held oral argument and an evidentiary hearing on the Motion to Suppress. In addition to arguments from the government and from defense counsel, the Court also heard testimony from Officer Robert Montague and Defendant Espinosa.

## II.    Legal Standard

The Fifth Amendment to the United States Constitution affords criminal defendants the privilege against self-incrimination. That privilege is protected by, among other things, the requirement that investigators inform potential defendants of their *Miranda* rights prior to conducting custodial interrogations. *Miranda v. Arizona*, 384 U.S. 436, 444, 472–73 (1966). The

3

failure to mirandize typically forbids prosecutors from using a defendant's statements made during the interrogation against that defendant. *Id.* at 476.

Deciding when statements are the result of custodial interrogation—and thereby implicate the protections of *Miranda*—occurs on a "case-by-case basis." *United States v. Mesa*, 638 F.2d 582, 584 (3d Cir. 1980). When investigators ask questions that "only a further a potential criminal prosecution," then *Miranda* undoubtedly applies. *United States v. Kiam*, 432 F.3d 524, 530 (3d Cir. 2006). In two-stage interrogations, second-stage statements are admissible where investigators obtain non-mirandized statements in the first stage but then receive those statements again, after a defendant is properly mirandized, in the second stage of the interrogation. *Oregon v. Elstad*, 470 U.S. 298, 314 (1985); *see also Reinert v. Larkins*, 379 F.3d 76, 90 (3d Cir. 2004) ("[A] careful and thorough administration of *Miranda* warnings cures the condition that rendered the unwarned statement inadmissible."). The one exception to this rule is when investigators use the first stage to deliberately flout *Miranda*; such deliberate flouting would render even the post-*Miranda* statements in the second stage of the interrogation inadmissible. *See Missouri v. Seibert*, 542 U.S. 600, 621 (2004) (Kennedy, J. concurring); *Kiam*, 432 F.2d at 532–33.

## III.    Discussion

The Court agrees with Espinosa that he should have been informed of his *Miranda* rights prior to the conversation in the middle bedroom at the house. The questioning there—alongside Espinosa being handcuffed, Espinosa knowing that his girlfriend was also handcuffed in the house, and the comments from the officers—created the "inherently compelling pressures [that] work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda*, 384 U.S. at 467. Because the Court credits Espinosa's testimony that he was not advised of his *Miranda* rights prior to his interrogation at the house, the statements that

4

Espinosa made to officers at the house in the middle bedroom are inadmissible and excluded from the government's case-in-chief.

Although the government maintains that the Advice of Rights form accurately captures the timing and location of when Espinosa was mirandized, the government makes a compelling secondary argument. Even if the Court credits Espinosa's version of events and finds that his statements made during the first stage of the interrogation were pre-*Miranda*, the statements at the FBI office are indisputably post-*Miranda*, such that the second-stage interrogation cures any inadmissibility concerns stemming from the improper first-stage interrogation under *Elstad*, *Seibert*, and *Kiam*. ECF No. 71 at 5–6.

The Court agrees with the government's alternative argument. The interrogation at the FBI office, which occurred after Espinosa was advised of his *Miranda* rights and after Espinosa signed the Advice of Rights form, cures the admissibility issues stemming from the first round of interrogation. Defense counsel concedes that the investigators did not use the first stage to evade *Miranda*'s protections. Hr'g Tr. at 67:6 – 8 ("I don't think [the officers] did it maliciously . . . I don't think they came in . . . [knowing] what [they]'re going to do is question him without *Miranda*. I don't think that's the case."). This concession is appropriate because the Court's own review of the evidence does not establish that there was any deliberate flouting of *Miranda*. Accordingly, the *Elstad* inference—that a second, post-*Miranda* interrogation may cure any pre-*Miranda* statements by a defendant in the first interrogation—applies. But the *Seibert*-and-*Kiam* exception to *Elstad*—a second interrogation cannot cure any inadmissibility problems when the first interrogation was used to deliberately evade *Miranda*—does not apply.

Espinosa urges the Court to liken the instance case to *U.S. v. Swanson*, where the Seventh Circuit applied *Seibert* to hold that statements made during a second round of interrogation were

5

inadmissible. 635 F.3d 995, 997 (7th Cir. 2011). But the coercive pressures that made Swanson's statements inadmissible are largely absent from Espinosa's case. Unlike here, for instance, Swanson "was refused information when he asked for explanation of his arrest, was presented with an arrest warrant stating he unlawfully possessed firearms, was simultaneously shown a court order to turn over all firearms, was repeatedly directed to comply with the court order by a police officer, and had been treated for mental illness but was at that time unmedicated." *Id.* at 1003; *see also id.* at 1004 (explaining that both of Swanson's interrogations occurred in police station interrogations rooms and that Swanson had known the interrogator for more than a year before his arrest and had developed a "particular responsiveness" to the interrogator). The Court therefore finds *Swanson* distinguishable and thus unhelpful to Espinosa's efforts.

## IV.    Conclusion

Accordingly, the Court concludes that (i) Espinosa's statements upon seeing his girlfriend handcuffed were made voluntarily, not responsive to interrogational pressure, and thus not protected by *Miranda*; (ii) Espinosa's statements made in the middle bedroom are suppressed because they were made during a custodial interrogation without Espinosa being advised of his *Miranda* rights; and (iii) Espinosa's statements made during his interrogation at the FBI field office are not suppressed because he was properly advised of his *Miranda* rights. An appropriate order follows.